Argued March 4; reversed April 21, 1936

CIAPANNA *v.* LINCOLN FIRE INSURANCE CO.
OF NEW YORK

(56 P. (2d) 1113)

*C. C. Hall*, of Portland (Robert A. Leedy, of Portland, on the brief), for appellant.

*J. C. Veazie*, of Portland (Veazie & Veazie, of Portland, on the brief), for respondent.

ROSSMAN, J. The parties agree that the defendant issued the $2,000 policy of fire insurance involved in this action, and that the policy was in effect at all times mentioned in the complaint. It covers a small dwelling house owned by the plaintiff. The parties also agree that two fires visited the premises, one on March 15, and the other on August 15, 1933. The damages inflicted by the first fire are in dispute. No repairs were made after that fire. The parties agree that the second fire caused additional damage to the extent of $500.

The question presented by this appeal is whether the circuit court erred when it held that the plaintiff could not recover for the loss inflicted by the fire on March 15, 1933, because the damage done by that fire had not been determined by a board of appraisers, in accordance with the provisions of the policy. The defendant had insisted, before the occurrence of the second fire, upon such an appraisement. There is no issue concerning the second fire.

The policy of insurance contains, among others, the following provisions:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, * * * In the event of disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss; * * *"

According to the proof of loss which the plaintiff filed with the defendant, the fire of March 15 inflicted damages to the extent of $1,800. Immediately after the fire an adjuster who represented the plaintiff, and another, who represented the defendant, attempted to adjust the loss. They concluded that $785 damage was caused by the fire; but their efforts to effect a settlement failed when the plaintiff refused to accept that amount of money. About this time the defendant began to insist upon an appraisement of the loss, in conformity with the above-quoted section of the policy. It appointed an appraiser, notified the plaintiff of his name, and requested that the plaintiff also appoint an appraiser. Thereafter, it frequently repeated its demands. The plaintiff was a common laborer, illiterate and quite ignorant. He experienced difficulty in understanding the purpose and significance of an appraisal. Repeated explanations apparently failed to enlighten him. He believed that he was entitled to have the house reconstructed by the defendant, and could not understand why he should accept anything else. Efforts to make him understand that he was required to submit to an appraisal only caused him to become excited. He

had an impediment in his speech, and, in his endeavors to express himself, switched back and forth between the English and Italian languages, thus rendering it impossible for others to understand him, while his overwrought condition precluded his understanding the meaning of the others. Later, the plaintiff was adjudged insane and was committed to the state hospital. Defendant's last demand for an appraisal was made in a letter dated August 2, 1933. It there stated:

"A demand is hereby made that the matter of Cash Value and Loss and Damage on said dwelling and articles contained therein be submitted to a Board of Appraisers; that as to both of said items we nominate and select W. L. Buckner as an appraiser for the Company; that you are hereby requested to submit the name of the appraiser that you may desire to represent you."

■ Without adverting to this phase of the situation further, we state that the uncontradicted evidence indicates that the defendant, in good faith, sought an appraisal. We are satisfied that the plaintiff's failure to yield to the defendant's demand was not the result of bad faith, but of ignorance.

While the defendant was still insisting upon an appraisal, and while the plaintiff, through an attorney, was trying to obtain a settlement without an appraisal, the second fire, that is, the one of August 15, 1933, occurred.

According to the testimony, the combined effect of the two fires damaged the structure 60 per cent, and the Portland ordinances will not permit of its being repaired. November 7, 1933, the plaintiff, in a letter prepared by his attorney, stated to the defendant:

"I hereby give you notice that I consent to an appraisal of the cash value, loss and damage, to the dwell-

ing and articles covered by the above-mentioned insurance policies, and that I nominate and select J. W. Darling as my appraiser."

December 22, 1933, the plaintiff and his attorney addressed another letter to the defendant, from which we quote:

"We hereby offer to appoint an appraiser to represent Michele Ciapanna in the matter of arbitrating the fire losses under the above policies, and we hereby now, and by this letter, offer to appoint such arbitrator to represent the insured. * * *"

From the defendant's reply to these letters we quote:

"In answer to same you are advised that there appears to be no occasion for an appraisal from the loss under fire of August 15, 1933, as the amount of that loss has been agreed upon, and the Company has offered payment and tendered draft in payment of same several times; and that after the fire of March 15, 1933 repeated demands for an appraisal were made by us as representatives of the Lincoln Fire Insurance Company, resulting only in positive refusals by the assured, and that under these circumstances, and in view of the complete destruction of the subject matter of insurance by the latter fire, the request of the assured for an appraisal comes too late for consideration."

In explanation of its refusal to consent to an appraisal after the second fire, the defendant contends that (1) after the first fire it was still possible to determine from the charred materials, the kind, size and quality of the materials out of which the house had been built, as well as the quality of the workmanship; therefore, an accurate appraisal could have been made at that time without recourse to testimony; (2) after the second fire much of this material had been destroyed; therefore, the defendant's right to a fair appraisal had been prejudiced; and (3) between the first and second

fires some damage was done to the house by factors for which the defendant was not liable—vandalism and weather—and it was impossible to determine from the conditions as they appeared after the second fire the extent to which these causes had damaged the structure.

The house was 18 by 42 feet in its ground floor dimensions. One of the defendant's witnesses described it thus: ''The building was a one and a one-half story, shingled roof, box construction, concrete foundation, was shiplapped, cloth lined and papered on the main floor, with the exception of the kitchen which was ceiled. The upstairs was plastered. There was a living room, dining room and kitchen—pardon me—living room and dining room in the main section of the building on the main floor and the kitchen, bath room and pantry in the built-in addition at the rear. That was a one-story section. There were two bedrooms upstairs which were plastered. The building was finished on the exterior with shingles.'' It was at least thirteen years old. Some of the electric fixtures were of an obsolete style and others were merely drop cords. The uncontradicted testimony of one of defendant's witnesses, who visited the structure immediately after the first fire, indicates that the workmanship was mediocre, and that the material out of which it was built was No. 3 grade, except the interior finish which was No. 2. A bathtub stood in the bathroom, but it had never been connected with the plumbing. The house had no heating system.

We shall now review the testimony which describes the damage done by the first fire. A. E. Hearn, an adjuster, who represented the defendant and who was called as its witness, was the only witness who attempted to give a comprehensive description of the damage done by the fires. His testimony is uncontra-

dicted, unless we deem the following general statement made by the plaintiff's wife to be at variance with it: "* * * all burned; we got nothing left; the window broken, floor, roof, everything." She gave no other description of the damage done by the fires, and her quoted language, possibly, referred to the combined effect of the two fires. Hearn inspected the house two days after the first fire, and we shall now quote from his testimony: "The fire originated, apparently, under the stairs leading to the second floor. That stairway started up right inside the front door, and the fire burned out the stairway so that it could not be used, and communicated to the living room and the front porch, the main portion of the damage being done only on that one side of the house. It extended out through the side wall and burned up the outside wall about a distance of four feet. The windows in the front part of the house were all broken. The room immediately over the stairway was damaged to a considerable extent by the knocking off of the plaster. The dining room and kitchen in the back—that is, the dining room in the center and the kitchen on the back were not hurt to any great extent; that is to say, there was no millwork or anything had to be replaced; it just had to be scraped and painted. There was no scraping necessary in the kitchen; it just had to be painted over. The paper on the living room was gone, and over near the stairway the shiplap on the walls was gone; it had to be renewed. Well, practically all the shiplap on that part of the house had to be renewed in the living room." He observed no damage to the roof, but another witness thought that a few shingles would have to be replaced.

We shall now review the testimony which describes the damage done by the second fire. There was no dis-

tinct dividing line between the damage done by the two fires that was discernible to anyone who had not visited the house before the second fire. Hearn visited the house the day after the second fire, and gave the only detailed description of the damage done by that fire. The following description by him is not contradicted: "I believe the second fire originated, as I remember, in the little hall between the pantry and the bathroom at the extreme end of the built-in addition on the back." It will be observed that its place of origin was some distance from the place of inception of the first fire. Hearn further swore: "The floor in the hallway between the bathroom and the pantry had burned through and the flames had gone up that wall, and apparently from there it —" Here the witness was interrupted, but resumed with the following: "The kitchen, which had not been damaged by actual burn in the first fire, was very badly burned over the ceiling and walls; in fact, the ceiling was practically all burned out. From the walls you could still tell what they were made of, but they were gone beyond any salvage. * * * There was a gas stove in the kitchen. After the first fire it needed only a little cleaning up, but after the second fire it had been strewn around the floor and showed evidence of having been done in the meantime. Also there was a bathtub, which I related before stood up on blocks, which disappeared." He was then asked about some "built-in cabinets" in the dining room, and testified. "They were on the wall, opposite wall to where the first fire started, and after the fire necessitated only scraping and painting. The second fire started in the rear of the house and apparently went diagonally across to the front door and missed the corner where these cabinets were.

There was no further fire damage done to the cabinets, but the doors had been broken and the shelves broken down.'' .The above constitutes the witness's entire description of the damage done by the second fire. The other witnesses added virtually nothing to his description. It will be observed that the two fires did not start in the same part of the house and did not burn over the same areas. The first fire which started under the stairway near the front of the house damaged the stairs, an upstairs bedroom, the living room, and somewhat scorched a portion of the dining room. The second fire started near the rear of the house and its principal damage was confined to the nearby kitchen, small passageway and bathroom. The witnesses, however, indicated that, to some extent, the damage wrought by the two fires overlapped; but we think the evidence does not warrant a belief that the overlapping damage was serious. Seven photographs, taken by Hearn after the second fire, are a part of the record. They show that the building is still standing. A portion of an outside wall near the bathroom was consumed by the blaze. Four other portions of the exterior walls where fire escaped through windows and the front door are scorched. Only one of these scorched areas is extensive.

So far as the record indicates, it was still possible, after the second fire, to determine the workmanship of construction, and the character of the materials out of which the house was built. There is no evidence that weather had caused any damage, although it was possible for rain to have entered through broken windows. None of the witnesses testified that vandals damaged the property between the first and second fires. It is true, as will be observed from Hearn's testimony, that after the second fire the bathtub was missing and the

dining room cabinets were broken. However, the bathtub was not a fixture, since it was not connected with the plumbing; and it is altogether possible that the dining room cabinets were damaged by the firemen in their efforts to extinguish the fires; at any rate, there is no testimony that that damage was done by trespassers.

From the above it will be observed that the plaintiff refused to join in an appraisal when the defendant demanded one, but after the second fire, when he insisted on an appraisal, the defendant declined to authorize one. The policy of insurance was in effect when both fires occurred.

The parties agree that an insurance company may expressly or by conduct waive its right, under policies of the character now before us, to have the amount of the loss determined by appraisal. They also agree that a refusal or delay by either party to comply with the other's demand for an appraisal does not forfeit the rights of the party in default to an appraisal, provided he later signifies a willingness to comply with the policy's provisions for an appraisal; and provided further that the conditions have not become so altered during the delay that the rights of the other party have been prejudiced. In the decisions which we shall now review these principles were applied by the courts, and while the facts in none of them parallel those now before us, nevertheless, a review of those decisions indicates how the aforementioned principles of law should be applied by us.

In *Knox-Burchard Mercantile Co. v. Hartford Fire Insurance Co.,* 129 Minn. 292 (152 N. W. 650), the policy of insurance covered the mercantile stock of a retail store which was damaged by fire February 9, 1914.

The defendant was promptly notified and objected to the removal of the damaged merchandise. February 16 it appointed an appraiser who was not disinterested. The plaintiff promptly appointed an appraiser, and then the defendant objected to him for the sole reason that he was an attorney. It instituted a suit to test his qualifications, and, after they had been sustained in the trial court, appealed to the supreme court where the decision was affirmed. While the suit was pending the insurance company's appraiser refused to deal with the one appointed by the insured, and thus no appraisal resulted. In the meantime, the plaintiff brought an action upon his policy, claiming that the defendant's unjustifiable attitude constituted a waiver of the policy's appraisal provision. This contention was sustained. It will be observed that the defendant, by a dilatory and unjustifiable course, proposed to subject the insured to an interminable delay in obtaining an appraisement. In the meantime, he would be subjected to the heavy expense of keeping the damaged merchandise upon his shelves.

In *Schrepfer v. Rockford Insurance Co.,* 77 Minn. 291 (79 N. W. 1005), the insured property was totally destroyed by a fire, and the plaintiff, after declining to yield to the defendant's appraisal, brought an action upon the policy. Upon the trial the action was dismissed, the court holding that an appraisal was a condition precedent to defendant's liability. Ten days later the plaintiff offered an appraisal, in conformity with the provisions of the policy, but the defendant asserted that her previous conduct had relieved it of liability. Thereupon she brought the action now under review. In sustaining a judgment in plaintiff's favor, the court said:

"While the claim is made that the plaintiff's demand for arbitration—or, rather, her consent to arbitrate—was not made within a reasonable time, there was no evidence that the defendant had sustained any loss, or been deprived of any legal right by the delay. * * * An unjustifiable refusal by the insured to enter into an arbitration on demand by the insurer, when it proximately results in damage to the latter by depriving him of some legal right, may doubtless defeat all right of action on the policy. For example, suppose, in this case, the property covered by the policy had been merely injured, but not destroyed, and the policy had given the defendant the right to take the goods at their appraised valuation, but before her offer to submit to arbitration the plaintiff had disposed of the goods, thus depriving the defendant of a valuable right, it would probably be held that the offer came too late; and that plaintiff's original refusal to arbitrate, coupled with her subsequent act in disposing of the goods, defeated any right of action on the policy. * * * It is not particularly the length of the delay, but the prejudicial consequence of it, that is material."

Here neither the delay nor the institution of the unwarranted action forfeited the insured's rights. Since the property was totally destroyed, the delay, in all likelihood, did not prejudice the insurer's rights.

In *Powers Drygoods Co. v. Imperial Fire Insurance Co.*, 48 Minn. 380 (51 N. W. 123), the insurance covered wholesale drygoods stock, worth $345,000. Defendant's policy was for $5,000. The damage inflicted by the fire, which occurred on November 27, 1890, was $152,861. December 5, 1890, plaintiff demanded an appraisement and nominated an appraiser. The defendant then appointed one P. A. Larson, giving him positive instructions to insist upon the appointment of either R. Warner or P. T. Kavanaugh as umpire. Plaintiff's appraiser acquiesced in the appointment of Warner.

Then Warner refused to serve. Next, the defendant instructed Larson to insist upon the appointment of Kavanaugh. Then Larson resigned as appraiser, and on December 18 the defendant appointed Kavanaugh as its appraiser. In the meantime, the plaintiff was being subjected to an expense of $5,000 monthly through maintaining the property in its damaged condition for the inspection of the appraisers, and its customers were going to other establishments. It now refused to arbitrate, assigning as its reason that the defendant's attitude was prompted by bad faith and was intended to force the plaintiff to accept an unfavorable compromise. March 2, 1891, it instituted an action upon the policy. The court pointed out that the defendant's conduct in influencing the appointment of the umpire was unlawful. In sustaining a judgment in the plaintiff's favor, it said:

"If the defendant did exercise such bad faith and misconduct in respect to proceedings for an appraisal by arbitrators, its defense that the plaintiff refused to enter upon another attempt to secure an appraisal cannot be allowed. One of the reasons for the insertion of provisions of this kind in policies of insurance is to provide a means for the speedy settlement and adjustment of the loss; and, as such a provision can only be carried into effect by the concurrent action of both parties, neither can rightfully refuse to act with reasonable promptness, when the other demands that such action be taken."

This decision, like the first one herein reviewed, indicates that even a short unjustifiable delay by the insurer may forfeit its right to an appraisal.

In *Johnson v. Phoenix Insurance Co.*, 69 Mo. App. 226, the facts were that the plaintiff instituted an action upon her policy without complying with the provisions

of the policy for arbitration of the loss. While the action was pending the plaintiff made a written offer to arbitrate, and then dismissed her action. Next, she commenced the one now under review. In sustaining a judgment in her favor, the court pointed out that arbitration was a condition precedent and that she had assumed the perils of delay:

"If such delay has been so extended as to materially injure or destroy the defendant's means or facilities for exhibiting the merits of the defense to the arbitrators, then such delay might defeat plaintiff's action altogether."

But the court found that no delay which prejudiced the defendant's rights had occurred. Again, neither delay nor a premature commencement of an action upon the policy forfeited the insured's rights.

From *McNees v. Southern Insurance Co.*, 69 Mo. App. 232, we quote:

"After the cause was determined here as we have stated, plaintiff, near two years after the loss, demanded an arbitration, and defendant refused, principally on the ground that the demand was too late. The policy does not prescribe a time within which arbitration shall be had, but, in this respect, only provides that the sum due plaintiff shall not be payable until sixty days after it shall have been fixed by the arbitrators and the award received by the defendant. * * * Of course, since, in the event of the parties disagreeing, plaintiff's cause of action depends on an arbitration for support, he takes upon himself the chance or peril which may happen from the delay. If a demand for appraisal should be made by the insured so late that defendant should refuse it, then if he could show by answer and proof that it refused for the reason that plaintiff had so delayed that it was impossible, or impractical to arbitrate, it would deprive plaintiff of the benefit of the arbitration."

In *Mechanics Insurance Co. v. Hodge,* 149 Ill. 298 (37 N. E. 51), the insured property was partially consumed by a fire which occurred June 28, 1889. While negotiations were pending for an adjustment of the loss, but before the defendant had asked for an arbitration, a second fire occurred on September 11, 1889. In October, 1889, the defendant asked for an arbitration to determine the loss by the fire of June 28 only. The plaintiff made no reply, but subsequently, and without having granted the arbitration, instituted an action upon the policy. In sustaining a judgment in his favor, the court held:

"The loss to be determined by agreement, or, if differences shall arise, to be determined by arbitration, is the loss sustained by the assured under the terms of the policy. The request of the adjuster asking for an arbitration to determine the loss and damage under the fire of June 28th, made more than 20 days after the loss by the second fire, was not a request to submit to arbitration the loss or damage sustained by the assured under the policy. It was not a request that by the terms of the contract the insured was bound to accede to. The company would have as much right to insist that each article destroyed was a separate loss, and an arbitration be had before different arbitrators as to each item destroyed. The company would have no right to place the assured in the position that he must split up his cause of action into several different causes of action."

In *Morley v. Liverpool & London & Globe Insurance Co.,* 85 Mich. 210 (48 N. W. 502), the policy of insurance covered a stock of merchandise owned by the plaintiff's assignor. A fire destroyed a part of the stock and damaged the rest. The policy made provision not only for an appraisal but also granted the defendant the right to take the damaged property at the appraised price. The insured insisted upon an appraisal,

but the defendant refused to submit to one because the insured no longer owned the damaged property. In holding that the defendant had not breached any right possessed by the insured when it declined to consent to the appraisement, the court said:

"He had disposed of the goods. He had deprived the defendant of the valuable right provided by the policy to take them at the appraisal."

In *Harrison v. Hartford Fire Insurance Co.* (Iowa), 80 N. W. 309, the facts were that after a fire in October, 1892, had damaged the insured property, both the plaintiff and the defendant appointed appraisers who could neither agree upon the amount of the loss nor upon an umpire. While the situation was pending in that condition, the plaintiff, in January, 1893, instituted an action upon the policy which was dismissed in January, 1894, upon the ground that it had been prematurely brought. In May, 1894, he instituted another action and, after a demurrer had been sustained to his complaint, dismissed it. He then sent the appraisers a notice, demanding that they proceed to make an appraisement and appointed a time and place for their meeting. The appraiser appointed by him appeared at the appointed time and place, but the appraiser appointed by the defendant ignored the notice. Thereafter the defendant made no effort to adjust the loss. Later, the plaintiff instituted the action now under review. In holding that the plaintiff was entitled to recover, even though no appraisement had been made, the court held that the fault lay with the defendant. We quote from the decision:

"It is also the law that if either party to an arbitration prevents or unreasonably delays the making of the award, he will not be permitted to rely upon the failure

to arbitrate as a defense to an action subsequently brought.''

In the first of these two decisions a slight delay accompanied by a change of conditions, which deprived the insurer of its contractual right to purchase the damaged property at the appraised price, forfeited the insured's right to an appraisal. In the next decision, a lengthy delay, unaccompanied with prejudicial circumstances, did not forfeit the insured's right.

In *Stephens v. Union Assurance Society,* 16 Utah 22 (50 P. 626, 67 Am. St. Rep. 595), a fire which occurred on December 15, 1895, consumed a part of the insured property. December 18 the plaintiff and the defendant each appointed an appraiser. After the appraisers had concluded that the damaged property was worth $500, plaintiff's appraiser insisted upon an appraisement of the consumed property, but the defendant's appraiser refused to proceed. Then the plaintiff filed a proof of loss whereupon the defendant denied all liability, claiming that the plaintiff did not own the insured property. January 13, 1896, a further effort was made to obtain an appraisement, but it also failed. May 21, 1896, the plaintiff instituted his action, whereupon the defendant demanded an appraisement of the consumed property. A judgment in the plaintiff's favor was sustained, the court declaring that the failure to obtain an appraisement of the entire property was the fault of the defendant, and that it could not take advantage of its own fault by defeating the plaintiff's action. Thus, a demand by the insurer for an appraisement, after an action has been instituted by the insured, comes too late.

From *Talbert v. Northwestern National Insurance Co.,* 167 La. 608 (120 So. 24), we quote:

"The second ground of defense, that no appraisement was made in accordance with the terms of the policy, is the one relied on by defendant before this court in order to defeat plaintiff's action. On this phase of the case, the evidence conclusively shows that, shortly after the fire occurred, the plaintiff suggested an appraisal, and that his suggestion was accepted by the defendant. Nevertheless, defendant made no serious effort to co-operate with plaintiff in obtaining the appraisement. Its policy was, apparently, to delay the appraisement by appointing a succession of appraisers and then withdrawing the appointments. In the meantime, the defendant's adjuster was doing his utmost to induce plaintiff to accept a settlement on defendant's terms. Finally, plaintiff, concluding that it was impossible to obtain an appraisement, abandoned the idea and sold the property as it stood. It was only after the purchaser had repaired the property, and an appraisement was impractical, that the defendant insisted that it be made. In view of defendant's neglect to actively avail itself of plaintiff's offer of an appraisement, and of the dilatory tactics it was pursuing in the adjustment of his loss, we think plaintiff was fully warranted in inferring that his only recourse was a resort to the courts for the determination of his rights."

In *Boston Insurance Co. v. Kirby,* (Tex. Civ. App.), 281 S. W. 275, fire damaged to the extent of $9,500 the plaintiff's $10,000 dwelling house. It occurred January 12, 1924, and on February 12, 1924, the plaintiff filed his proof of loss. In sustaining a judgment for the plaintiff, the court said:

"The jury in answer to special issue found that the demand for appraisal made by each of the companies was not made within a reasonable time. There is sufficient evidence in the record to support the finding. While the insurance company could reasonably contract for the right to demand and receive an appraisal as provided by terms of its policy, yet it cannot

be said that they could wait their own time to make such demand, but it must be presumed and contemplated the demand would be made in a seasonable and reasonable time. In this case appellants waited for 58 days on one policy and 59 on the other, after receiving proof of loss, before making demand. It being a question of fact to what would constitute a reasonable time, and the jury having found against appellee on that issue, it cannot be said that appellants were within their contractual rights at the time their demand was made.''

From *Hamilton v. Liverpool & London & Globe Insurance Co.,* 136 U. S. 242 (10 S. Ct. 945, 34 L. Ed. 419), we quote:

''That correspondence clearly shows that the defendant explicitly and repeatedly in writing requested that the amount of the loss or damage should be submitted to appraisers in accordance with the terms of the policy; and that the plaintiff as often peremptorily refused to do this; unless the defendant would consent, in advance, to define the legal powers and duties of the appraisers, (which the defendant was under no obligation to do) and that the plaintiff throughout, against the constant protest of the defendant, asserted, and at last exercised, a right to sell the property, before the completion of an award according to the policy, thereby depriving the defendant of the right, reserved to it by the policy, of taking the property at its appraised value, when ascertained in accordance with the conditions of the policy.''

See to the same effect *Astrich v. German American Insurance Co.,* 131 Fed. 13, and *Insurance Company v. Carnahan,* 63 Ohio St. 258 (58 N. E. 805).

██ From the above decisions—and we know of none to the contrary—it is evident that the plaintiff's failure to yield to the defendant's demand for an appraisal did not, in itself, forfeit his right to recover for the first fire. Delay, even when accompanied by a positive refusal to appoint an appraiser, does not forfeit the

insured's right to recover. To effect a forfeiture, it is essential that in the period of delay the rights of the insurer have been adversely affected, and it is essential that the adverse effect be substantial. It will be observed from the decisions reviewed above that the only intervening circumstance which the courts have so far recognized as a prejudicing factor is a sale of the damaged goods, in denial of the insurer's right to purchase them at the appraised value. Such a sale necessarily deprives the insurer of a right possessing substantial value. The decisions reviewed above indicate that a wider variety of circumstances are prejudicial to the insured than to the insurer. This is necessarily true, for, ordinarily, only a change in the condition of the damaged property can prejudice the rights of the insurer, whereas the expense and inconvenience of the delay are additional factors which may affect the insured. We believe that the authorities warrant the statement that an offer to submit to an appraisement, made by the insured, is timely if not unreasonably delayed, and if no prejudice has been incurred by the insurer in the meantime.

In defendant's letter of February 9, 1934, which rejected the plaintiff's offer of an appraisal made in plaintiff's letters of November 7, 1933, and December 22, 1933, the defendant based its refusal on the ground "of the complete destruction of the subject matter". It is abundantly clear from the evidence that the "subject matter" had not been completely destroyed. The four exterior walls, the roof, the two floors and all of the partitions were still standing after the two fires; in fact, some of the wallpaper was still on the wooden walls. At the trial the contentions itemized in a preceding paragraph were advanced to support the

claimed forfeiture. But the evidence previously reviewed indicates that the second fire did not materially affect the portions of the structure charred by the first fire. Had an appraiser entered the house after the second fire, he could still have inspected the boards charred by the first fire—they were but little affected by the second fire. The two fires burned in different parts of the house, and the defendant was liable for the damage done by each fire. So far as we can determine a fair appraisal of the loss inflicted by the two fires could have been made subsequent to August 15, 1933. It is impossible to believe that the weather or vandalism did any material damage to the structure in the period of the delay, because, on August 2, thirteen days before the second fire, the defendant still demanded an appraisal, and requested the plaintiff to ''name your appraiser within a reasonable time from date of this notice''. It is evident that at that time the defendant knew of no reason why a fair appraisement could not be made.

It is our belief that the record contains no justification for the claimed forfeiture. A verdict should not have been directed against the plaintiff on the first cause of action. The judgment of the circuit court is reversed. The cause will be remanded.

CAMPBELL, C. J., KELLY and BELT, JJ., concur.